UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BARBARA ADEYEMI**,                    Case No. 1:11 CV 423

       Plaintiff,                    Magistrate Judge James R. Knepp, II

   v.                    MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.

### INTRODUCTION

Plaintiff Barbara Adeyemi appeals the administrative denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The District Court has jurisdiction over this case under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms the Commissioner's denial of benefits.

### BACKGROUND

Plaintiff was born April 21, 1954. (Tr. 94). She is not married and has two children, one of whom is an adult. (Tr. 36–37). Plaintiff filed an application for SSI on January 31, 2006, alleging a disability onset date of January 2, 2004. (Tr. 94).

Medical History

Plaintiff has a documented medical history of asthma (Tr. 293), osteoarthritis (Tr. 293), "chronic" anemia (Tr. 454, 458), sciatica (Tr. 346–347), eczema (Tr. 205), psoriasis (Tr. 293), goiter (Tr. 216, 220, 293), COPD (Tr. 366), and fibromyalgia (Tr. 428), among other unrelated things. She has also been lactose intolerant her whole life. (Tr. 50, 450).

Starting in late 2003, Plaintiff unexpectedly began to steadily gain weight, increasing from 167 pounds to 213 pounds in about nine months. (Tr. 174). She was referred to an endocrinologist as a result. (Tr. 175). Though Plaintiff testified to having an underactive thyroid (Tr. 50), one of her physicians, David C. Parris, M.D., reported inconsistent thyroid studies (Tr. 175, 272). Her records show "multiple thyroid nodules with various echogenic texture scattered throughout both". (Tr. 217). Later tests, from December 2005, showed "no significant change in the appearance of the thyroid gland" with no apparent change in their sizes. (Tr. 211).

Plaintiff's doctors conducted a biopsy on one of her thyroid nodules in August 2004, and found the tissue was benign. (Tr. 214). The biopsy also showed "no evidence of chronic thyroiditis". (Tr. 214). Nevertheless, she has been diagnosed with "equivocal hypothyroidism". (Tr. 214). Her endocrinologist has reported she "has a goiter with abnormal thyroid functions of unclear etiology." (Tr. 220).

Elizabeth Roter, M.D., had been treating Plaintiff for about three years at the time Plaintiff filed her SSI application. (Tr. 222). Dr. Roter, a rheumatologist, reported in January 2006 Plaintiff had "osteoarthritis (mild)" in her knees with occasional knee swelling, as well as "some carpal tunnel". (Tr. 223). This was later clarified by John Bucchieri, M.D., as being bilateral carpal tunnel with no atrophy in either hand. (Tr. 345). Dr. Roter also noted that Plaintiff limps. (Tr. 223). X-rays of Plaintiff's knees from February 2005 showed "joint effusion in the suprapatellar bursa". (Tr. 251). Dr. Roter repeated this finding at a later exam in 2007 while also finding osteophytosis, peaking of the tibial spines, and a superior patellar enthesophyte. (Tr. 375).

In September 2008, Dr. Roter, noted "12 FM tender pts", indicating a diagnosis of fibromyalgia. (Tr. 531). The diagnosis of fibromyalgia was repeated by Dr. Roter in her treatment

notes the following year. (Tr. 428, 595).

Plaintiff has had asthma for several years (Tr. 224, 477–479, 485–486), for which she is currently prescribed Singulair. Dr. Parris reported this works well and gives her "good control of her asthma". (Tr. 176, 177). However, Plaintiff was seen at the emergency room because of her asthma in October 2006 (Tr. 310), at which point she was prescribed prednisone (Tr. 312). She has had several asthma attacks in her adult life (Tr. 477–479, 485–486, 546), though her asthma has become relatively well-controlled with Azmacort and Combivent (Tr. 522). Despite her asthma, Plaintiff at one point smoked two packs of cigarettes a day. (Tr. 220). By 2006, this had been reduced to half a pack a day. (Tr. 224). According to her hearing testimony in 2009, she began taking Chantix and her smoking has since been further reduced to three cigarettes a day. (Tr. 32).

Plaintiff has complained of constant back and neck pain since at least 2002. (Tr. 274, 278, 280–288, 316, 383). She has "pain throughout her daily tasks". (Tr. 278). In January 2004, Dr. Parris ordered an MRI after she complained of pain in her mid-thorax radiating to her mid-chest. (Tr. 177). The MRI showed a small bulge at T7-8 and C5-6 with "no herniation or cord compression." (Tr. 178). Plaintiff's bone marrow signal and bone alignment were "unremarkable" and no abnormal signal in her spinal cord was seen. (Tr. 199). Plaintiff's chest pain caused her to have a heart catheterization at one point, which showed no blockages. (Tr. 224, 441). Plaintiff takes 750 milligrams of Vicodin three or four times a day for her pain. (Tr. 307).

A.K. Bhaiji, M.D., examined Plaintiff in May 2006. (Tr. 224). He reported Plaintiff "would not have difficulty with work-related physical activities such as sitting [though she] may have difficulty standing, walking, lifting, and carrying objects." (Tr. 225). Dr. Bhaiji also reported "good" knee flexors and extensors despite Plaintiff's arthritis. (Tr. 226–227).

3

Plaintiff has a documented history of skin abnormalities. She has been diagnosed with eczema and possible psoriasis, having lesions that last for about 24 hours. (Tr. 205). Her dermatologist's records indicate her skin problems "would result in some difficulty in 'hand' tasks". (Tr. 205).

In August 2006, Plaintiff underwent a physical residual functional capacity (RFC) assessment conducted by Esberdado Villanueva, M.D. (Tr. 300). Dr. Villanueva reported Plaintiff walks with a slight limp and has "mildly reduced muscle" strength in both knees. (Tr. 294). Dr. Villanueva also noted Plaintiff's eczema, goiter, asthma, and fluid filled papules on her digits. (Tr. 294). He concluded Plaintiff could occasionally lift or carry 20 pounds, frequently lift of carry 10 pounds, and stand or walk for about six hours in an eight-hour workday. (Tr. 294). He also concluded Plaintiff can stoop and crouch frequently but climb, kneel, and crawl only occasionally. Dr. Villanueva reported no manipulative limitations, no visual limitations, no environmental limitations, and no communicative limitations. (Tr. 296–297). With respect to Plaintiff's statements about her symptoms, Dr. Villanueva reported they were consistent with the medical evidence and proportionate to the expected severity or expected duration of Plaintiff's impairments. (Tr. 298).

In November 2006, neurologist Leonard M. Weinberger, M.D., conducted an electromyograph on Plaintiff. (Tr. 341–342). He reported no abnormal findings. (Tr. 342).

Over time, Plaintiff's bilateral carpal tunnel has gotten worse, though Dr. Bucchieri still described it as "mild in degree". (Tr. 355). In January 2007, Dr. Bucchieri recommended "continued conservative care" of Plaintiff's carpal tunnel with splinting and anti-inflammatory medications. (Tr. 254). Around the same time, Plaintiff's left ring finger lost all flexion due to a flexor tendon rupture of the digitorum profundus tendon. (Tr. 344, 349, 354). Plaintiff continued to experience pain in this

4

finger even though she could not bend it at all. (Tr. 345). Dr. Bucchieri said Plaintiff's MRI showed her ring finger injury was "not amendable to surgical repair" and referred her to occupational therapy. (Tr. 354).

Plaintiff was discharged from physical therapy in June 2007 and instructed on a home exercise program to maximize her therapy. (Tr. 380, 551). Plaintiff reported feeling a little better after completing her home exercise program (Tr. 381). She still had "marked crepitus" and pain in her knees throughout her therapy (Tr. 557, 563, 567), and thereafter went through a second round of physical therapy in 2009 (Tr. 577-591). Her joint pain in her neck, back, shoulder, knees, and hands, has persisted. (Tr. 571, 577–578).

Administrative Hearing

The ALJ held a hearing on April 3, 2009, attended by Plaintiff with counsel. (Tr. 27). Also testifying were medical expert Franklin Plotkin, M.D., and vocational expert Mark Anderson. (Tr. 27).

Plaintiff testified about her prior work history. She explained she had gone a few years without working before the onset of her alleged disability because of her asthma, which had been worse in the past. (Tr. 35). She said her longest job, though it was more than fifteen years before her application, was as the Deputy Director of the Black and Puerto Rican Legislative Caucus in the New York Legislature. (Tr. 38). In that job, she did a lot of writing about legislative issues. (Tr. 40). More recently, Plaintiff worked at a law office and as an accounting assistant. (Tr. 38, 39). As an accounting assistant, she handled the time cards for 80 to 100 employees. (Tr. 43). In terms of her education, Plaintiff said she started out at a four year college but did not finish it, receiving instead an associates degree in 1997. (Tr. 39). She expressed a desire to return to college at some point. (Tr.

39).

Plaintiff was asked about her left ring finger. (Tr. 33). She testified it was explained to her as a snapped tendon, and the finger does not bend at all as a result. (Tr. 33–34). She wears a ring splint on it, but is limited in what she can do with her hands because she cannot move the finger out of the way to fully utilize her other fingers. (Tr. 33–35).

Plaintiff testified about her pain. She said it hurts her legs and lower back to walk, due to her arthritis and two bulging discs. (Tr. 37–38). Plaintiff also testified she weighed 218 pounds the morning of the hearing, and said her weight gain was due to her underactive thyroid. (Tr. 44, 48, 50). She testified she could not walk a city block and would have difficulty walking on uneven surfaces. (Tr. 43). She only goes upstairs at her house about once a week. (Tr. 44–43). She said she can only sit or stand for approximately 20 minutes before having to switch. (Tr. 44). She also said she has difficulty sleeping, only getting about three hours of sleep a night. (Tr. 45). Furthermore, she said she is always fatigued, probably because of her anemia. (Tr. 45).

Plaintiff testified about her residual functional capacity. She said her son does all of the "heavy" chores around the house like taking out the trash, mopping the floor, and taking the laundry up and down; she tends to stay in her bedroom or kitchen. (Tr. 45). Plaintiff said she still cooks and occasionally cleans. (Tr. 46). She said she is able to kneel down but needs help getting back up. (Tr. 47). She also said she would not be able to lift an eight-pound item on a repetitive basis during a work day, and later reiterated she could not lift ten pounds frequently. (Tr. 47, 66).

Medical Expert Dr. Plotkin testified about Plaintiff's impairments after asking Plaintiff a few questions. He opined that Plaintiff's asthma is well-controlled by medication, and she has a multi-nodule goiter but it is being treated with thyroid supplement. (Tr. 53). He questioned whether

6

Plaintiff's weight gain could have been from her thyroid function because of the supplements. (Tr. 53). He also said she has psoriasis with skin manifestations, and an iron deficiency anemia being treated with supplements, "but no arthritis"and no record of psychological problems. (Tr. 53–54). "In general", he said, "her health problems are mild [and] she sounds like she's in good cheer . . . . I can't find anything either physical or mental that is severe." (Tr. 53–54). He then agreed with Plaintiff's August 2006 RFC assessment suggesting Plaintiff is capable of performing light work. (Tr. 55).

Dr. Plotkin addressed Plaintiff's fibromyalgia. He asked whether Plaintiff is receiving psychological counseling – a concept Plaintiff immediately protested. (Tr. 54). Dr. Plotkin explained,

> [T]he whole idea of fibromyalgia, which has become a very frequently diagnosed thing in people who are depressed and somatize their mental problems into physical problems, like arthritis and so on. A 55 year-old woman is entitled to a certain amount of arthritis. Especially if she's carrying extra weight and especially in places like the knees or the ankles or the hips. . . . I think that it would be reasonable to suggest that she get some kind of psychological evaluation.

(Tr. 56). Plaintiff responded that she "ha[s] problems with" Dr. Plotkin's apparent dismissal of her pain as possibly psychological. (Tr. 57).

Vocational expert Mark Anderson testified about Plaintiff's prior work history. He said her work as an accounting clerk was sedentary and skilled, and her work as a payroll clerk was sedentary and semi-skilled. (Tr. 60). The ALJ then instructed the vocational expert to assume a hypothetical person the same age, education, and with the same work experience as Plaintiff. (Tr. 61). This hypothetical person has the further limitations of being able to lift or carry ten pounds frequently and 20 pounds occasionally, only occasionally climbing stairs or ramps, only occasionally engaging in fine manipulation with either hand, only occasionally kneeling or crawling, not working

around dust, fumes, gasses, or cigarette smoke, and only sitting, standing, or walking for about six hours in an eight-hour workday. (Tr. 61–62). When asked what jobs, if any, this hypothetical individual could perform in the national economy, the vocational expert replied with Plaintiff's prior jobs of payroll clerk and accounting clerk, but also added cashier, laboratory sample carrier, and mail sorter. (Tr. 62–64). According to his testimony, each of these jobs accounts for thousands of positions in the regional economy. (Tr. 62–64).

In addition to testimony, the ALJ considered two third-party questionnaires submitted by friends of Plaintiff's. (Tr. 500–511). These friends report Plaintiff's endurance has diminished, she is unable to sit, stand, or lay down for a prolonged period of time, she is unable to lift things more than 20 pounds, unable to braid hair or squeeze a jar opener hard enough to use it, and unable to clean her house without stopping to rest. (500–501, 508). The questionnaires also speak of Plaintiff's pain, saying she seems to be in a lot of discomfort that her medications do not seem to alleviate. (Tr. 503, 506, 510).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

9

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

The ALJ determined Plaintiff had several severe impairments, none of which met or medically equaled one of the listed impairments. (Tr. 17–18). The ALJ then concluded Plaintiff had a residual functional capacity to perform light work. (Tr. 18). The ALJ determined Plaintiff "is credible as to the nature of her symptoms, but not credible in her claim they are of disabling severity." (Tr. 19).

Plaintiff's only argument contends the ALJ erred by failing to properly evaluate Plaintiff's treating physician diagnosis of fibromyalgia. This argument touches upon on the deference given to treating sources. An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able

10

to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. The Sixth Circuit has held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). A medical provider is *not* considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

Here, Plaintiff's treating rheumatologist, Dr. Roter, diagnosed her with fibromyalgia. (Tr. 428, 531, 595). Plaintiff argues the ALJ failed to properly defer to Dr. Roter's diagnosis by relying too heavily upon objective testing in finding no disability. Plaintiff says the nature of fibromyalgia requires less emphasis on objective medical tests.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and

11

stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). CT scans, X-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.; see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no join swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. Thus, Plaintiff relies on *Rogers* and *Preston* to argue that the ALJ focused too heavily on the absence of objective medical tests confirming Dr. Roter's diagnosis. This argument is mistaken, however.

First, this case is not like *Rogers*. In *Rogers*, the ALJ summarily dismissed the diagnosis of fibromyalgia. The ALJ was confronted with treating source diagnoses of fibromyalgia and "reflect[ed] some hesitancy in identifying this accepted medical condition as a severe impairment, [which], in turn, influenced the ALJ's weighing of the treating physician evidence." *Rogers*, 486 F.3d at 243. The ALJ in *Rogers* determined the claimant did not suffer from fibromyalgia "based primarily upon objective evidence . . . demonstrating 'fairly normal clinical and test results.'" *Id.* He impliedly dismissed or minimized the diagnosis of fibromyalgia by accepting the opinions of non-treating sources over the diagnoses of treating physicians without discussing the standard for diagnosing fibromyalgia. *Id.* Here, on the other hand, the ALJ agreed that Plaintiff has the severe impairment of fibromyalgia, consistent with the opinion of Dr. Roter, one of Plaintiff's treating

12

physicians. (Tr. 17). While the medical expert may have dismissed Plaintiff's fibromyalgia diagnosis as somatized psychological symptoms, the ALJ did not adopt this view and did not give less than controlling weight to Dr. Roter's diagnosis. Moreover, the ALJ did not give less than controlling weight to any opinions from Dr. Roter; Dr. Roter's records simply do not suggest Plaintiff is totally disabled, despite her fibromyalgia diagnosis.

Courts have interpreted *Rogers* as not establishing special rules for treating source opinions with respect to fibromyalgia. *Cooper v. Astrue*, 2010 WL 5557448, at *4 (W.D. Ky. 2010). "As in any other case, the ALJ's decision must give 'good reasons' for the weight given to the treating physician's opinion." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). "The mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *Id.* As the Sixth Circuit has said: "[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815).

Here, medical records from Dr. Roter – the only physician who made the fibromyalgia diagnosis – provide no support for a finding of total disability. If anything, they indicate Plaintiff is not "one of the minority" who are totally disabled by fibromyalgia. While Dr. Roter's notes recite that Plaintiff "always has pain", they also indicate she is nonetheless able to exercise at home. (Tr. 424). In fact, Dr. Roter's notes reflect some uncertainty about whether Plaintiff even has fibromyalgia. For instance, in February 2008, she reported Plaintiff had zero fibromyalgia tender

13

points. (Tr. 425). In August 2008, she only reported ten fibromyalgia tender points[1] and said "Pt *might* have FM." (Tr. 424) (emphasis added). Also, Dr. Roter check-marked "doing well" for her impression of Plaintiff on multiple occasions. (Tr. 428, 429). At the very least, there is simply no indication from Dr. Roter's records that Plaintiff's fibromyalgia has totally disabled her.

This case is similarly distinct from *Preston*. In *Preston*, the ALJ found a severe impairment of fibrositis (fibromyalgia) but found no disability despite a treating physician's opinion that the claimant's pain was so bad she could not pull or push with her arms, could not use her right leg for repetitive motions, and could not repeatedly bend, squat, crawl, climb, or reach, and could only sit or stand for no more than 20 minutes at a time. *Preston*, 854 F.2d at 818–819. Here, no treating or non-treating source of record suggests anything near such stark limitations. As mentioned above, Dr. Roter never indicated similar limitations, and was actually equivocal on whether Plaintiff even has fibromyalgia.

Second, overwhelming evidence from other sources substantially supports the ALJ's conclusion. There is ample medical evidence in the record, from both non-treating sources and treating sources other than Dr. Roter, indicating the mild severity of Plaintiff's physical ailments. For instance, Dr. Bucchieri reported her carpal tunnel as "mild". (Tr. 344, 355). Dr. Bhaiji reported Plaintiff had no difficulty getting off of his exam table. (Tr. 225). In the assessment forms Dr. Bhaiji filled out for the Bureau of Disability Determination, he indicated Plaintiff has normal grasp, manipulation, pinch, fine coordination, and range of motion for everything except her spine and knees. (Tr. 226–227). Plus, Dr. Villanueva, after conducting a physical RFC assessment, concluded

---

1. The American College of Rheumatology requires "a criteria of eleven tender points out of eighteen at a given examination to support a diagnosis of fibromyalgia." *Fay v. Astrue*, 2011 WL 3678322, at *4 (S.D. Ind. 2011).

14

Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry ten pounds, and stand or walk for about six hours in an eight-hour work day. (Tr. 294). In his notes, Dr. Villanueva found "moderately reduced" range of motion in the spine and both knees, but no stenosis of impingement, and only mildly reduced muscle strength. (Tr. 294). This RFC assessment is thus consistent with the ALJ's conclusion.

Importantly, records from Plaintiff's physical therapy show exercise resulted in reducing her pain. (Tr. 280, 284). At one point, her pain was a consistent 4 on a scale of 1–10, after previously being a 6. (Tr. 280, 291). Similarly, records from University Hospital reported a "good" rehabilitation potential. The same records repeated multiple times that Plaintiff experienced pain relief from her physical therapy. (Tr. 278, 284). Such improvement in pain from physical therapy is evidence of pain not severe enough to be totally disabling. *See Perkins v. Apfel*, 14 F. App'x 593, 600 (6th Cir. 2001) (noting that improvement in pain from medication therapy counters a determination of disability); *see also Hansen v. Metropolitan Life Ins. Co.*, 192 F. App'x 319, 322 (6th Cir. 2006) (stating the conclusion of no disabling injury was "bolstered" by a therapist's report of improvement from physical therapy).

There is even support for the ALJ's conclusion in the third-party questionnaires submitted on Plaintiff's behalf. In one of them, the friend says Plaintiff is unable to "lift things to[o] heavy (over about 20 lbs.)" (Tr. 500), implying she is able to lift things up to "about 20" pounds. This evidence supports the ALJ's conclusion that Plaintiff is capable of lifting ten pounds frequently.

In sum, the ALJ did not give less than controlling weight to Plaintiff's treating physicians. To the contrary, he accepted Dr. Roter's diagnosis of fibromyalgia and correctly examined the medical records for evidence of the impairment's severity. He even correctly incorporated Plaintiff's

15

dermatologist's limitation of "difficulty in 'hand' tasks" in his hypothetical to the vocational expert. (Tr. 205, 62).

Ultimately, as unique as fibromyalgia may be, it does not carve out an exception to the Social Security Act's mandate that "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability". 42 U.S.C. § 423(d)(5)(A). Subjective claims of disabling pain must be supported by objective medical evidence. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852–853 (6th Cir. 1986). Here, substantial evidence in the record, both medical and non-medical, supports the ALJ's conclusion of no disability. While the record establishes, and the ALJ agreed, that Plaintiff has an impairment the nature of which prevents objective confirmation of its diagnosis, there is no medical opinion in the record to substantiate Plaintiff's subjective allegations of disabling pain. To the contrary, there is substantial evidence supporting the conclusion that her pain is not so severe as to be totally disabling. Therefore, the decision of the ALJ must be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying benefits supported by substantial evidence. The Commissioner's decision is affirmed.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge

16